**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT HANKINS, | ) | C.A. No. 09-182 Erie |
|     Plaintiff | ) | |
| | ) | |
|     v. | ) | District Judge McLaughlin |
| | ) | Magistrate Judge Baxter |
| COMMONWEALTH OF | ) | |
| PENNSYLVANIA, et al., | ) | |
|     Defendants. | ) | |


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**


**I.     RECOMMENDATION**

It is respectfully recommended that:

    1.    Defendant Burnsworth's Motion for Summary Judgment [ECF No. 139] be granted;

    2.    The Commonwealth Defendants' Motion for Summary Judgment [ECF No. 142] be granted in part and denied in part; and

    3.    The Fayette County Defendants' Motion for Summary Judgment [ECF No. 144] be denied insofar as it is based on Plaintiff's failure to exhaust administrative remedies, but otherwise granted on the merits of Plaintiff's claims.


**II.     REPORT**

**A.     Relevant Procedural History**

On July 20, 2009, Plaintiff Robert Hankins, a prisoner currently incarcerated at the State Correctional Institution at Rockview in Bellefonte, Pennsylvania ("SCI-Rockview")[1], filed this civil rights action pursuant to 42 U.S.C. § 1983 against: (i) the Commonwealth of Pennsylvania ("Commonwealth") and various individuals employed by the Pennsylvania Department of

---
[1]

Plaintiff was formerly incarcerated at SCI-Forest in Marienville, Pennsylvania, and SCI-Albion, Pennsylvania.

Corrections ("DOC")(hereinafter collectively referred to as "Commonwealth Defendants"); (ii) several Fayette County public defenders, assistant district attorneys, and Fayette County Jail officials (hereinafter collectively referred to as "Fayette County Defendants"; (iii) Timmie Burnsworth, LPN ("Burnsworth"), a nurse at Fayette County Jail; (iv) Gloria Poindexter ("Poindexter"), and Rhonda Sherbine ("Sherbine"), Health Services' employees under contract to provide medical services to inmates at SCI-Forest; (v) Mayor James R. Sileo ("Sileo"); and (vi) Gregory Packaging, Inc. ("Gregory Packaging"), incorrectly identified by Plaintiff as "Gregory Packing, Inc." [ECF No. 3].

The Commonwealth Defendants named in the complaint are: Jeffery Beard, the DOC's Secretary of Corrections ("Beard"); Cindy G. Watson, the DOC's Chief Grievance Officer ("Watson"); Margaret M. Gordon, R.D. the DOC's Clinical Dietician ("Gordon"); John S. Shaffer, PhD, Executive Secretary at the DOC ("J. Shaffer"); E.P. Bush, Acting Deputy for Centralized Services at SCI-Forest ("Bush"); Nelson Zullinger, identified as "Right-to-Know Official" ("Zullinger"); "Joseph D.," Hearing Examiner; E.M. Weaver, Hearing Examiner ("Weaver"); Timothy J. Mark, Chief Hearing Examiner ("Mark"); L.S. Kerns-Barr, Hearing Examiner ("Kerns-Barr"); Z. Moslak, Hearing Examiner ("Moslak"), Kerri Cross, Hearing Examiner ("Cross"); John Andrade, Hearing Examiner ("Andrade"); "Yates," Chief Grievance Official; Kristen P. Reisinger, Chief Grievance Official ("Reisinger"); Raymond Sobina, former Superintendent at SCI-Forest ("Sobina"); Michael Barone, Deputy Superintendent at SCI-Forest ("Barone"); L.H. Heaster, Deputy Superintendent at SCI-Forest ("Heaster"); Kevin Dittman, Food Services Manager 1 at SCI-Forest ("Dittman"); Edward Heberling, Food Services Manager 2 at SCI-Forest ("Heberling"); Donald Skunda, CCHP at SCI-Forest ("Skunda"); Carol Kennedy, Grievance Coordinator at SCI-Forest ("Kennedy"); Kurt Grandlund, Deputy at SCI-Forest ("Grandlund"); Jolene B., R.D.H. at SCI-Forest ("Jolene"); Pamela Sutton, Dental Assistant at SCI-Forest"); John Ames, CFMM-III at SCI-Forest ("Ames"); Sergeant McKnight, a corrections

officer at SCI-Forest ("McKnight"), "Whitehead," a corrections officer at SCI-Forest; S.S. Best, a corrections officer at SCI-Forest ("Best"); Joan Delie, CHCA at SCI-Forest ("Delie"); Deb Woodard, Commissary Supervisor at SCI-Forest ("Woodard"); "Miller," a corrections officer at SCI-Forest; S.Satterlee, Counselor at SCI-Forest ("Satterlee"); "Huapt," Unit Manager at SCI-Forest; Lt. Younkin, a corrections officer at SCI-Forest ("Younkin"); and P. McKissock, Hearing Examiner at SCI-Albion ("McKissock").

The Fayette County Defendants named in the complaint are: Gary Brownfield, Jr., Court Officer ("Brownfield"); George Barker, Court Officer ("Barker"); Ed Dunkard, incorrectly identified by Plaintiff as "Ed Denker," Court Officer ("Dunkard"); Mark Matthews, Court Officer ("Matthews"); Mike Zavada, incorrectly identified by Plaintiff as "Lt. Salvoda" ("Zavada"); Lawrence Chapman, Sr., incorrectly identified by Plaintiff as "Lt. Chaplyn" ("Chapman"); Larry Medlock, Warden at Fayette County Jail ("Medlock"); Barry Croftcheck, Assistant Warden at Fayette County Jail ("Croftcheck"); Jamee Waligura, Counselor at Fayette County Jail ("Waligura"); Thomas W. Shaffer, Esq., public defender ("T. Shaffer"); Jeffrey W. Whiteko, Esq., public defender ("Whiteko"); Michael J. Garofalo, Esq., public defender ("Garofalo"); Michelle Kelley, Esq., Assistant District Attorney ("Kelley"); and Eugene Grimm, Esq., Assistant District Attorney ("Grimm").

Plaintiff subsequently filed an Amended Complaint on October 22, 2009 [ECF No. 64], adding as Defendants Judge Steven P. Leskinen ("Leskinen"), Edward Fike ("Fike"); and Tom Corbett ("Corbett"). Defendants Leskinen and Fike, as well as original Defendant Sileo, were never served and have since been dismissed from this case. (See ECF No. 138).

All Defendants previously filed motions to dismiss Plaintiff's claims against them. By Memorandum Order of District Judge Sean J. McLaughlin, dated September 7, 2010, the motions to dismiss filed by Defendants Poindexter and Sherbine [ECF No. 100], and Defendant Gregory Packaging were granted in full, and said Defendants were terminated from this case.

[ECF No. 119]. Judge McLaughlin also granted in part and denied in part the motions to dismiss filed by the Commonwealth Defendants [ECF No. 77], the Fayette County Defendants [ECF No. 79], and Defendant Burnsworth [ECF No. 84], such that the following claims remain:

1. An Eighth Amendment claim against Commonwealth Defendants Kennedy, Sobina, Watson, Beard, and Woodard arising from the alleged stoppage of Plaintiff's medically prescribed/recommended toothpaste;

2. A Fourteenth Amendment due process claim against Commonwealth Defendants Weaver, Kerns-Barr, Mark, Moslak, Andrade, and McKissock, challenging the manner in which Plaintiff's disciplinary hearings were conducted;

3. A retaliation claim against Commonwealth Defendants Best and McKnight regarding their alleged denial of toiletries to, and verbal harassment of, Plaintiff;

4. An Eighth Amendment claim against Commonwealth Defendants Zullinger, Gordon, Heberling, Sobina, Heaster, J.Shaffer, Dittman, Skunda, Kennedy, Reisinger, and Beard, for alleged deliberate indifference to Plaintiff's health and safety relative to the food that was served at SCI-Forest;

5. A First Amendment free exercise of religion claim against Fayette County Defendants Chapman, Medlock, Croftcheck, and Waligura;

6. An Eighth Amendment claim against Fayette County Defendants Brownfield, Barker, Dunkard, and Matthews for excessive use of force arising from their alleged activation of a "stun belt" on Plaintiff;

7. An Eighth Amendment claim against Fayette County Defendants Chapman, Medlock, Croftcheck, and Waligura for deliberate indifference to Plaintiff's health and safety arising from his alleged placement in a cell with an inmate "with mental health problems" who "had feces and urine throughout his assigned cell;"

8. An Eighth Amendment claim against Fayette County Jail Defendants arising from Plaintiff's alleged placement in a cell, on or about January 3, 2008, with "glass all over the bed frame, and exposed live electrical wires;"

9. An Eighth Amendment claim against Fayette County Defendants Chapman, Croftcheck, Medlock, and Waligura regarding the conditions in the Fayette County Jail's Special Housing Unit ("SHU"); and

4

> 10. An Eighth Amendment claim against Defendant Burnsworth for deliberate indifference to Plaintiff's serious medical needs following an incident on February 6, 2008, in which Plaintiff was allegedly "electrified" by use of a stun belt.

(ECF No. 119, at pp. 6-8). All other claims asserted by Plaintiff against the Commonwealth Defendants, the Fayette County Defendants, and Defendant Burnsworth were dismissed, and all other Defendants not specified in the foregoing claims were terminated from this case. (Id.).

The parties have since completed discovery, and the remaining Defendants have now filed motions for summary judgment [ECF No. 139, 142, 144], in response to which Plaintiff has filed briefs in opposition [ECF No. 167, 170, 171]. This matter is now ripe for consideration.

## C. Standards of Review

### 1. Summary Judgment

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56©. The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502

(3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247-249.

## 2. *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" Haines v. Kerner, 404 U.S. 519, 520 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. See Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969)("petition prepared by a prisoner... may be inartfully drawn and should be read 'with a measure of tolerance'"); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997)(overruled on other grounds). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

**D.**     **Discussion**

        **1.**     **Claims v. Commonwealth Defendants**

                **a.**     **Eighth Amendment Claims**

                        **i.**     **Toothpaste Claim**

Plaintiff claims that, "sometime around July of 2007, the Department of Corrections interfered with and stopped [him] from obtaining prescribed/recommended med. toothpaste to stop the pain [he] suffered." He alleges further that Defendants Kennedy, Sobina, Watson, and Beard were all "made aware of the problem yet were deliberately indifferent to [his] serious med. needs when they did nothing to correct the wrong." (Amended Complaint at ¶¶ 28-29). In particular, Plaintiff alleges that he "wrote request to staff slips to... [Defendant] Sobina... to no

avail," that he "was then forced to write a letter to [Defendant] Beard which went unanswered," and that he "also wrote [Defendant] Woodard to no avail." (Id. at ¶ 30).

Previously, this Court recommended that the foregoing claim be allowed to proceed beyond the pleading stage, giving credence to Plaintiff's allegations that "the toothpaste was medically 'prescribed/recommended' and that the named Defendants essentially ignored his requests to have the toothpaste restored to him." (See ECF No. 115, Report and Recommendation, at p. 33). In light of the evidence that has since been submitted, the Court now finds that this claim has no merit.

Plaintiff's deposition testimony reflects that he obtained special permission, rather than a prescription, to purchase sensitive toothpaste from the commissary some time prior to his arrival at SCI-Forest. (ECF No. 143-1, Plaintiff's deposition transcript, at pp. 7-8 (internal pp. 80-81)). At some point during Plaintiff's incarceration at SCI-Forest, the brand of toothpaste that he had obtained permission to purchase was removed from the master commissary list. (Id. at p. 8 (internal pp. 82-83)). In response to Plaintiff's grievance regarding the removal of the toothpaste from the commissary list, Defendant Sobina explained that "[t]he commissary list is established by the Department of Corrections Central Office with no flexibility at the institutional level for deviation." (See ECF No. 143-2 at pp. 5-6). Thus, Plaintiff's request that the sensitive toothpaste be returned to the commissary could not be met by the officials at SCI-Forest, since it was out of their control. Nevertheless, Plaintiff subsequently obtained a prescription from the prison dentist, which enabled him to obtain the sensitive toothpaste from the medical department. (See ECF No. 143-1, Plaintiff's deposition transcript, at pp. 8-9 (internal pp. 83-88)).

Based on the foregoing, there is no evidence to support Plaintiff's claim that the named Defendants were deliberately indifferent to his medical need for sensitive toothpaste, and summary judgment should be entered in favor of Defendants Kennedy, Sobina, Watson, and Beard accordingly.

### ii        Food Service

Plaintiff claims that "[t]he entire time [he] was housed at Forest, [his] health & safety was placed at risk for serious harm w[h]ere [he] became sick due to the deliberate indifference actions [sic] of the food service dept." (Amended Complaint at Section IV.C, ¶ 43).  In particular, Plaintiff raises the following complaints, which are set forth verbatim from the Amended Complaint:

> 44.    Due to fish served at Forest, myself as well as other prisoners and staff became sick after eating.  Also bad/molded juice was served from the time I arrived at Forest until I was transferred, and of which I became sick and had [to] seek med. attention.

> 45.    Food trays were used which contained contaminated dish water on a daily basis, which was due to old trays with cracks in them being used and not discarted [sic].  And in no way due to condinsation [sic].

> 46.    On many occasions food was served cold due to the electrical cord being missing from the heated food cart.

> 47.    Several occasions bad fruit was served which also placed my health & safety at risk for serious harm.  Due to the cups used and the way food was transported to the unit/block - half of its content would spill out. Hot cakes were served half cooked before, as well.

> 48.    Many meals I received soggy bread which I refused to eat....

> 49.    As a result of the unsafe & unhealthy food practices not only did I become sick - but I did not receive the 2,000 calories per day as required by DOC policy, and well established law.

(Id. at ¶¶ 44-49).

Plaintiff claims that he notified Commonwealth Defendants Zullinger, Gordon, Heberling, Sobina, Heaster, J.Shaffer, Dittman, Skunda, Kennedy, Reisinger, and Beard, "to no avail." (Id. at ¶ 48).  The Commonwealth Defendants argue, *inter alia*, that Plaintiff's food-related claims must be dismissed because he has failed to allege that any of the named

Defendants played an affirmative part in the complained-of misconduct.

When a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct. Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Although a supervisor cannot encourage constitutional violations, a supervisor has "no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct." Id. quoting Brown v. Grabowski, 922 F.2d 1097, 1120 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991). The supervisor must be personally involved in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1958, 1207 (3d Cir. 1988). Section 1983 liability cannot be predicated solely on *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976); see also Monell v. Department of Social Services, 436 U.S. 658 (1978) (superiors of line officers who act in violation of constitutional rights may not be held liable on a theory of vicarious liability merely because the superior had a right to control the line officer's action); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293-1295 (3d Cir. 1997) (to hold police chief liable under § 1983 for violating female subordinate officer's rights, she was required to prove that he personally participated in violating the her rights, that he directed others to violate her rights, or that he had knowledge of and acquiesced in his subordinates' violations). If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official. Rode, 845 F.2d at 1208; Cooper v. Beard, 2006 WL 3208783 at * 14 (E.D.Pa. Nov. 2, 2006).

Here, Plaintiff offered the following deposition testimony regarding the named Defendants' "involvement" in his food-related claims: (i) Defendant Zullinger was made aware of the "bad/molded" juice after the fact, and did not provide a response to Plaintiff's liking (ECF No. 143-1, Plaintiff's deposition transcript, at pp. 14-15 (internal pp. 109-111)); (ii) Defendant Gordon allegedly gave Plaintiff an "asinine" response after he informed her of the food issues (Id.

10

at p. 16 (internal p. 114)); (iii) Defendant Heberling was made aware of Plaintiff's issues after the fact through grievances and request slips (Id. at p. 16 (internal p. 115)); (iv) Defendant Sobina was also made aware of Plaintiff's food issues after the fact through grievances and request slips (Id. at p. 16 (internal p. 116)); (v) Defendant Beard was made aware of Plaintiff's food complaints after the fact when Plaintiff wrote him a letter (Id. at p. 17 (internal p. 118)); and (vi) Defendant Kennedy was made aware of the food issues through the processing of Plaintiff's grievances (Id. at p. 16 (internal p. 117)). In addition, Plaintiff was unable to identify Defendants Heaster, Shaffer, Skunda, Dittman, and Reisinger and, thus, could not offer any evidence of their "involvement" in the food-related issues. (Id. at pp. 16-17 (internal pp. 116-118)). Thus, Plaintiff has failed to demonstrate that any of the foregoing Defendants were personally involved in the complained-of misconduct regarding Plaintiff's food-related claims, and summary judgment should be granted in favor of said Defendants accordingly.

### b.        Fourteenth Amendment Due Process Claim

Plaintiff claims that his "due process rights were violated due to the many disciplinary hearings held at SCI-Forest and Albion which were contrary to law,..." (ECF No. 64, Amended Complaint, at ¶ 55). In particular, Plaintiff claims he was "denied an adequate opportunity to prepare and present a defense; the HEX (Hearing Examiner) was not impartial, and used a practice/custom of denying all witnesses whom are prisoners that would have pose[d] no hazard or security concerns; denied [him] assistance where [he] could not collect statements nor evidence due to [his] confinement in the RHU...; and did not apply the proper standard of review by state mandatory law by not applying the preponderance of evidence standard, instead relied on the unsworn report." (Id. at ¶ 56).

To establish a due process claim under the Fourteenth Amendment, Plaintiff must demonstrate (i) the existence of a constitutionally protected liberty or property interest; and

(ii) constitutionally deficient procedures by the state in its deprivation of that interest.  Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972).  If there is no protected interest, there is no need to determine whether the alleged deprivation was without due process.  Alvin v. Suzuki, 227 F.3d 101, 116 (3d Cir. 2000).

The Supreme Court has held that a prisoner's state created liberty interest is limited to those situations that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).  "In deciding whether a protected liberty interest exists under *Sandin*, we consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions." Mitchell, 318 F.3d at 531-32, citing Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000).  In applying these factors, the Third Circuit has reached differing conclusions, "reflecting the fact-specific nature of the *Sandin* test." Mitchell, 318 F.3d at 532, comparing, *inter alia*, Shoats, 213 F.3d at 144 (eight years in administrative confinement, during which inmate was locked in his cell for all but two hours per week, denied contact with his family, and prohibited him from visiting the library or "participating in any education, vocational, or other organization activities," clearly implicated a protected liberty interest), with Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002)(seven months of disciplinary confinement did not implicate a liberty interest), and Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997) (administrative detention for a period of 15 months, which imposed strict restrictions on outside contact and personal conveniences, did not impose atypical and significant hardship and, thus, did not implicate a liberty interest).

Nonetheless, it appears clear that, in determining what constitutes an "atypical and significant hardship" for those in disciplinary confinement, the relevant inquiry is "whether the conditions of [the inmate's] confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement." Shoats, 213 F.3d at

144.  See also Leamer v. Fauver, 388 F.3d 532, 546 (3d Cir. 2002)("under *Sandin* a court must assess whether administrative segregation, or its concomitant conditions, constitute an 'atypical and significant hardship' by comparing the circumstances of [the inmate's] placement with those of others within comparable confinement"); Wagner v. Hanks, 128 F.3d 1173 (7th Cir. 1997)(state prison inmate's due process claim based on inmate's placement in disciplinary segregation was to be evaluated by comparing conditions of inmate's confinement with conditions of segregation in state's entire prison system, not just inmate's individual prison).

Here, Plaintiff has not pled any facts to indicate that his liberty interests were implicated by his confinement in the RHU at SCI-Forest and SCI-Albion.  Nothing in the complaint alleges any condition of confinement that was appreciably different from the conditions of other similarly situated inmates.  In fact, the only hardship Plaintiff alleges to have suffered as a result of his lengthy confinement in the RHU is that he was "denied to partake in programs recommended and prescribed by the DOC, as well as court mandated programs," which caused him to be "ineligible for parole." (ECF No. 64, Amended Complaint, at ¶¶ 111-112).  However, the granting of parole prior to the expiration of a prisoner's maximum term is not a constitutionally-protected liberty interest that is inherent in the Due Process Clause.  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1 (1979).

Because Plaintiff has failed to show that his conditions of confinement in the RHU were "significantly more restrictive than those imposed upon other inmates in solitary confinement" pursuant to Shoats, he has failed to establish the deprivation of a liberty interest.  See Dantzler v. Beard, 2007 WL 5018184, at *7 (W.D.Pa. Dec. 6, 2007).  Accordingly, summary judgment should be granted in favor of Commonwealth Defendants Weaver, Kerns-Barr, Mark, Moslak, Andrade, and McKissock, on Plaintiff's due process claim against them.

**c.**     **Retaliation Claim**

Plaintiff alleges that "[d]ue to complaints [he] made against DOC staff,... [Defendants] Best and McKnight retaliated against [him] by refusing him toothpaste, soap, toilet paper (etc.), and by loudly stating that [he] was a baby raper, rat, and homosexual." (ECF No. 64, Amended Complaint, at ¶ 41).

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990). "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

> In order to state a prima facie case of retaliation, a prisoner must demonstrate:
> 1) the conduct in which he was engaged was constitutionally protected;
>
> 2) he suffered "adverse action" at the hands of prison officials[2]; and
>
> 3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally protected activities. Carter, 292 F.3d at 158. "Once a prisoner has demonstrated that his exercise

---

[2]

To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225. See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

This Court previously found that Plaintiff sufficiently stated a *prima facie* case of retaliation against Defendants Best and McKnight to avoid dismissal at the pleading stage. (ECF No. 115, Report and Recommendation, at p. 42). Now, the Commonwealth Defendants argue that Plaintiff's "Amended Complaint is devoid of allegations of a causal link between any protected activity and any alleged adverse action, and this deficiency is even more evident now that the record has been developed. Plaintiff simply has no evidence sufficient to support a finding of causation." (ECF No. 147, Commonwealth Defendants' Brief, at p. 11). The Court agrees with this argument as it pertains to Defendant Best, but disagrees with this argument as it pertains to Defendant McKnight.

In particular, Plaintiff has failed to produce any evidence of record indicating that he filed any grievances or complaints against Defendant Best that could be found to have caused Defendant Best to take retaliatory action against Plaintiff. While "at the summary judgment stage, the [plaintiff] need only produce 'evidence from which a reasonable jury could conclude' that the exercise of his right was a substantial or motivating factor in the prison officials' actions," it has been firmly established that the plaintiff "must provide more than a 'scintilla of evidence' to survive summary judgment." Jones v. Vaughn, 2005 WL 1971869, at *31 (E.D.Pa. Aug. 16, 2005), citing Booth v. Pence, 354 F.Supp.2d 553, 560 (E.D.Pa. 2005). Plaintiff has failed to meet this burden as to his retaliation claim against Defendant Best, and summary

judgment should be entered in favor of Defendant Best, accordingly.

The same cannot be said, however, with regard to Plaintiff's retaliation claim against Defendant McKnight. Plaintiff has produced copies of inmate requests that he filed during the period from May 31, 2007, to July 14, 2007, in which he characterized Defendant McKnight as being "out of control," and accused Defendant McKnight of withholding meals from him, sexually and verbally harassing him, and interrupting his sleep by turning his cell lights off and on throughout the night. (ECF No. 168-2 at pp. 16-23). Plaintiff represents that these request slips were written prior to Defendant McKnight's alleged retaliatory acts. (See ECF No. 167, Plaintiff's Opposition Brief, at p. 8). Although Plaintiff does not specify the date(s) on which Defendant McKnight's alleged retaliatory acts occurred, he has produced enough evidence to, at least, raise a genuine issue of material fact as to the causal connection between the exercise of his First Amendment rights and Defendant McKnight's alleged actions to avoid the entry of summary judgment on the basis of causation.

Nonetheless, the Commonwealth Defendants assert that, even if Plaintiff is found to have stated a *prima facie* case of retaliation against Defendant McKnight, the evidence shows that Defendant McKnight's actions "were clearly motivated by legitimate penological interests." (ECF No. 147, Commonwealth Defendants' Brief, at p. 11). This they must prove by a preponderance of the evidence. Carter, 292 F.3d at 158. In an effort to meet this burden, the Commonwealth Defendants have submitted Defendant McKnight's declaration, in which Defendant McKnight declares, *inter alia*, that he "do[es] not have any specific recollection of ever refusing to give [Plaintiff] cleaning supplies, commissary, and/or basic issue supplies. If I ever refused to give [Plaintiff] cleaning supplies, commissary, and/or basic issue supplies, it was because he was disruptive and did not follow the [proper] procedure...." (ECF No. 143-2 at p. 14, ¶ 7). In addition, Defendant McKnight declares that he "never denied [Plaintiff] cleaning supplies, commissary, and/or basic issue supplies out of retaliation for any complaints, lawsuits, and/or

grievances he may have filed." (Id. at ¶ 10). Defendant McKnight further denies that he ever referred to Plaintiff as a "baby raper," homosexual, or snitch, and declares that he "never made any comments that [Plaintiff] was a homosexual, snitch, or baby raper in retaliation for any complaints, lawsuits, and/or grievances that [Plaintiff] may have filed." (Id. at ¶¶ 13-15).

None of the foregoing declarations establish that Defendant McKnight's alleged actions were motivated by legitimate penological interests; rather, Defendant McKnight is simply denying that he committed the acts of which he has been accused in retaliation for Plaintiff's exercise of his constitutional rights. This is insufficient to overcome Plaintiff's *prima facie* case of retaliation, particularly in light of Plaintiff's contrasting deposition testimony reiterating Defendant McKnight's alleged retaliatory acts. (See ECF No. 143-1 at pp. 11-13 (internal pp. 94-102)). Thus, genuine issues of material fact remain as to whether Defendant McKnight committed the acts of which Plaintiff complains and, if so, whether the acts were retaliatory or committed in furtherance of legitimate penological interests. For this reason, summary judgment should be denied Defendant McKnight as to Plaintiff's retaliation claim against him.

### 3. Claims v. Fayette County Defendants

#### a. Exhaustion of Administrative Remedies

The Fayette County Defendants argue that the claims against them should be dismissed for Plaintiff's failure to comply with the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), which provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until *such administrative remedies as are available* are exhausted.

<u>Id</u>[3] (emphasis added).

### i.      The Exhaustion Requirement

The requirement that an inmate exhaust administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes. <u>Porter v. Nussle,</u> 534 U.S. 516 (2002); <u>Concepcion v. Morton</u>, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement). Administrative exhaustion must be completed prior to the filing of an action. <u>McCarthy v. Madigan</u>, 503 U.S. 140, 144 (1992). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies. <u>Grimsley v. Rodriquez</u>, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997).[4] The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow. <u>Nyhuis v. Reno</u>, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").[5]

_____

[3]

It is not a plaintiff's burden to affirmatively plead exhaustion. <u>Jones v. Bock</u>, 549 U.S. 199, 217 (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Instead, the failure to exhaust must be asserted and proven by the defendants. <u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002).

[4]

Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction. <u>Nyhuis v. Reno</u>, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that ç1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

[5]

There is no "futility" exception to the administrative exhaustion requirement. <u>Banks v. Roberts,</u> 2007 WL 3096585, at * 1 (3d Cir.) <u>citing Nyhuis</u>, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that 'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'"). <u>See also</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system. Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ..."). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." Id. at 83; see also Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) (" Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

### ii.    The Administrative Process Available
### to Fayette County Prison Inmates

No analysis of exhaustion may be made absent an understanding of the administrative process available to inmates at the Fayette County Prison. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 107 U.S. at 217.

In this regard, the Fayette County Prison's grievance policy and procedure is set forth in the Inmate Handbook provided to its inmates. (See ECF No. 146-7 at p. 9 (internal p. 35)). The handbook provides that "inmates who wish to file a grievance must submit the grievance in writing ... to ... the Deputy Warden of Security ... within 5 calendar days of the incident or

occurrence of the alleged injustice....  The appropriate Deputy Warden will conduct an investigation of the allegation and communicate his findings and decision to the grieving inmate without unnecessary delay....  Within two (2) calendar days of receiving the decision of the Deputy Warden the inmate may appeal the decision to the Warden....  The Warden will communicate his findings and decision to the grieving inmate without unnecessary delay....  The Warden's decision is final and there is no further administrative appeal. (Id.).

### iii.   Analysis

In support of their argument that Plaintiff failed to exhaust his administrative remedies, the Fayette County Defendants have submitted the Declaration of Brian Miller, Warden of the Fayette County Prison, who declares, *inter alia*, that "Plaintiff did not file any grievances for the issues raised in his lawsuit." (ECF No. 146-5 at p. 1, ¶ 6).  In response, however, Plaintiff asserts that "when he tried to obtain a grievance form via the process set-up at FCP, he was denied." (ECF No. 171, Plaintiff's Opposition Brief, at p. 9).  Plaintiff further explains that he was housed at Fayette County Prison for only six to seven days before he was returned to SCI-Forest; yet, he sent letters to Fayette County Prison requesting that grievance forms be sent to him to allow him to exhaust his administrative remedies, which letters allegedly went unanswered. (Id. at pp. 8-9).

In this regard, Plaintiff has attached a number of exhibits evidencing his numerous attempts to obtain grievance forms from the Fayette County Prison. (ECF No. 172-1 at pp. 1-28).  Based on this evidence, the Court finds that the Fayette County Prison's grievance process was not made available to Plaintiff so as to allow him to properly exhaust his administrative remedies.  See McKinney v. Guthrie, 2009 WL 274159, at * 1 (3d Cir. Feb. 20, 2009) ("[A]n administrative remedy may be unavailable if a prisoner is prevented by prison authorities from pursuing the prison grievance process."); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) ("A grievance procedure is not available even if one exists on paper if the defendant prison officials

somehow prevent a prisoner from using it."); <u>Brown v. Croak</u>, 312 F.3d 109, 113 (3d Cir. 2002) ("Assuming security officials told Brown to wait for the termination of the investigation before commencing a formal claim, and assuming the defendants never informed Brown that the investigation was completed, the formal grievance proceeding required by DC-ADM 804 was never "available" to Brown within the meaning of 42 U.S.C. § 1997e."). Thus, Plaintiff's failure to exhaust his claims against the Fayette County Defendants should be excused.

## b.       Statute of Limitations

The Fayette County Defendants next argue that Plaintiff's Eighth Amendment claims concerning the conditions of confinement in the Fayette County Prison's SHU and his alleged housing with an inmate with mental health problems are barred by the applicable statute of limitations. The Court agrees.

The federal civil rights laws do not contain a specific statute of limitations for § 1983 actions. However, it is well established that the federal courts must look to the relevant state statute of limitations for personal injury claims to determine the applicable limitations period. <u>Sameric Corp. Del., Inc. v. City of Philadelphia</u>, 142 F.3d 582 (3d Cir. 1998)(internal citations omitted). In this regard, federal courts sitting in Pennsylvania have adopted Pennsylvania's two year personal injury statute of limitations set forth at 42 Pa.C.S.A. § 5524, in determining that a § 1983 claim must be filed no later than two years from the date the cause of action accrued. <u>See Lake v. Arnold</u>, 232 F.2d 360, 368 (3d Cir. 2000); <u>Urrutia v. Harrisburg County Police Dept.</u>, 91 F.3d 451 (3d Cir. 1996). Furthermore, a claim under § 1983 accrues when the plaintiff "knew or should have known of the injury upon which [his] claim is based." <u>Sameric</u>, 142 F.3d at 599.

Here, Plaintiff's claims against the Fayette County Defendants were raised in his original complaint that was filed with this Court on July 20, 2009, but was signed by Plaintiff on July 10, 2009. Thus, for purposes of applying the statute of limitations, this Court will treat July 10,

2009, as the relevant filing date pursuant to the prison mailbox rule. See Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa.Super. 2001), citing Commonwealth v. Little, 716 A.2d 1287 (Pa.Super. 1998)(in determining the date upon which a prisoner's pleading is filed, Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]"). Accordingly, any claims based on incidents that occurred more than two years prior to July 10, 2009, i.e., before July 10, 2007, are barred by the statute of limitations.

### i. Conditions of Confinement in the SHU

Plaintiff has asserted an Eighth Amendment claim against Fayette County Defendants Chapman, Croftcheck, Medlock, and Waligura, which consists of various complaints regarding the conditions of his confinement in the Fayette County Prison's Special Housing Unit ("SHU"). The Fayette County Defendants have placed in evidence Plaintiff's inmate housing record from the Fayette County Prison, which discloses that Plaintiff was housed in Fayette County Prison's SHU on July 20, 2006, and during the period from January 31, 2007 and February 9, 2007. (ECF No. 146-1). Thus, the latest date on which Plaintiff was subjected to the conditions of confinement in Fayette County Prison's SHU was February 9, 2007, over two years and five months prior to the date Plaintiff filed this action. As a result, Plaintiff's Eighth Amendment conditions of confinement claim is time-barred and summary judgment should be entered in favor of Fayette County Defendants Chapman, Croftcheck, Medlock, and Waligura, accordingly.

### ii. Placement with Inmate with Mental Health Problems

Plaintiff claims that Fayette County Defendants Chapman, Medlock, Croftcheck, and Waligura were deliberately indifferent to his health and safety when they allegedly placed him in a filthy cell with a mentally-challenged cell mate. In his amended complaint, Plaintiff identifies the inmate "with mental problems" as "Bernie Krymposki." (ECF No. 64, Amended Complaint,

at ¶ 64). The Fayette County Defendants note that the proper spelling of this inmate's last name is "Kremposky," and that the prison records indicate that Plaintiff was never placed in a cell with Mr. Kremposky. (ECF No. 148, Fayette County Defendants' Brief, at p. 9). Rather, Plaintiff and Kremposky were housed on the same cell block at the Fayette County Prison during the period from January 4, 2007, to January 17, 2007. (See ECF Nos. 146-1 (Plaintiff's inmate housing record) and 146-2 (Kremposky's inmate housing record)). Since the last date on which Plaintiff and Kremposky were on the same cell block – January 17, 2007 – was more than two and one-half years prior to the date Plaintiff instituted this lawsuit, any claim related to Plaintiff's confinement on the same cell block as Kremposky is time-barred. As a result, summary judgment should be entered in favor of Fayette County Defendants Chapman, Medlock, Croftcheck, and Waligura on this claim.

### c.    First Amendment Free Exercise of Religion Claim

Plaintiff complains that, while he was at the Fayette County Prison, his religious rights were violated by Fayette County Defendants Chapman, Medlock, Croftcheck, and Waligura, because he was not provided consultation with a "religious representative his entire time their [sic] to practice his belief," and was denied the ability to keep "religious materials" and newspaper in his cell. (Amended Complaint at Section IV.C, ¶¶ 1, 105-107).

It is well-established that prisoners have a First Amendment right to practice religion while incarcerated. Bell v. Wolfish, 441 U.S. 520, 544 (1979). However, the right to practice one's religion while in prison is not absolute. See Price v. Johnston, 334 U.S. 266, 285 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Under the First Amendment, regulations or policies that infringe upon a prisoner's rights to religious

freedom must pass a reasonableness standard, rather than the usual strict scrutiny standard.[6]

Turner v. Safley, 482 U.S. 78, 89 (1987). "When a prison regulation impinges on inmates'

constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

interests." Turner, 482 U.S. at 89. Courts generally accord great deference to prison officials'

adoption and execution of policies, regulations, and practices relating to the preservation of

internal order, discipline, and security within the prison environment. Thornburgh v. Abbott, 490

U.S. 401, 407-08 (1989); Turner, 482 U.S. at 85.

With regard to the provision of a religious representative, the Third Circuit Court has

recognized that the Free Exercise Clause does not require a prison to provide an inmate with a

religious representative; rather, the First Amendment prevents a prison from unreasonably

barring an inmate's access to one. See Gittlemaker v. Prasse, 428 F.2d 1 (3d Cir. 1970).

Specifically, the Third Circuit in Gittlemaker found that,

> The requirement that a state interpose no unreasonable barriers to the free
> exercise of an inmate's religion cannot be equated with the suggestion
> that the state has an affirmative duty to provide, furnish, or supply every
> inmate with a clergyman or religious services of his choice. It is one
> thing to provide facilities for worship and the opportunity for any clergy
> to visit the institution. This may be rationalized on the basis that since
> society has removed the prisoner from the community where he could
> freely exercise his religion, it has an obligation to furnish or supply him
> with the opportunity to practice his faith during confinement. Thus, the
> Free Exercise Clause is satisfied.
>
> But, to go further and suggest that the Free Exercise Clause demands that
> the state not only furnish the opportunity to practice, but also supply the
> clergyman, is a concept that dangerously approaches the jealously
> guarded frontiers of the Establishment Clause....

428 F.2d at 4.

---

[6]

Strict scrutiny is not required because courts need to "afford appropriate deference to prison officials" so that they
may "anticipate security problems and adopt innovative solutions to the intractable problems of prison
administration." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) quoting Turner v. Safley, 482 U.S. at 89.

Thus, to prove his free exercise rights have been violated, Plaintiff must show that the Fayette County Defendants unreasonably barred his access to a religious representative of his choice. This he cannot do. The Fayette County Prison's Inmate Handbook provides that "a visit from [an inmate's] Pastor or Spiritual Advisor ... must be during their regular schedule visiting period...." (ECF No. 177-1 at p. 30 (internal p. 33)). To arrange for such a visit, "[i]nmates are required to fill out an authorized visiting card listing each person that he/she wishes permitted to visit him/her." (Id. at p. 28 (internal p. 31). "Inmates are permitted to select five (5) adult (18 years) person(s) and one (1) religious advisor that he/she wishes to have visit him/her while incarcerated at the Prison." (Id.).

There is no evidence of record showing that Plaintiff ever put the name of any religious representative on his approved visitor list at Fayette County Prison. In fact, Brian Miller, Warden at Fayette County Prison ("Warden Miller"), has certified that "[t]here are no records of the Fayette County Prison reflecting plaintiff placing a religious representative on a visitor list." (ECF No. 146-5, Declaration of Brian Miller, at ¶ 16). The only relevant evidence submitted by Plaintiff is a request slip dated January 5, 2008, in which Plaintiff asked to "see the Imam (Muslim chaplain) as soon as possible." (ECF No. 172-1 at p. 40). This request was not in compliance with the visitation policy outlined in the Inmate Handbook. Yet, there is also no evidence indicating that this request was denied.

In short, the evidence of record demonstrates that the Fayette County Prison had an established policy and procedure in place to allow each inmate access to a religious representative of his choice. Plaintiff has failed to present any evidence demonstrating that he followed this policy and procedure, yet was denied access to a religious representative, or that the Fayette County Defendants unreasonably barred his access to a religious representative in any event. Similarly, Plaintiff has failed to present any evidence that he was denied access to his religious materials at the Fayette County Prison. Thus, summary judgment should be granted in

favor of Fayette County Defendants Chapman, Medlock, Croftcheck, and Waligura on Plaintiff's First Amendment free exercise of religion claim.

### d. Eighth Amendment Excessive Use of Force Claim

Plaintiff claims that, on or about February 6, 2008, Fayette County Defendants Brownfield, Barker, Dunkard, and Matthews used excessive force when they "electrified" him with a stun belt while escorting him from the Fayette County Court back to the Fayette County Jail. (Amended Complaint at ¶¶ 16-20). Plaintiff alleges that the stun belt was activated as "an act of retaliation for speaking out once confronted by a court officer whom also worked at SCI-Fayette." (Id. at ¶ 17). As a result, Plaintiff alleges that he "lost all bowel movement" and has since suffered "constant and permanent pain, and injury to [his] right thumb." (Id. at ¶ 27).

When a prisoner alleges that an officer used excessive force against him, the "core judicial inquiry" is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Wilkins v Gaddy, __ U.S. __, 130 S.Ct. 1175, 1178 (2010), quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992). In determining whether an officer used excessive force, "courts look to several factors including: (1) 'the need for the application of force;' (2) 'the relationship between the need and the amount of force that was used;' (3) 'the extent of the injury inflicted;' (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them;' and (5) 'any efforts made to temper the severity of a forceful response.' Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000), quoting Whitley v Albers, 475 U.S. 312, 321 (1986).

The Fayette County Defendants argue that the undisputed facts regarding the incident at issue warrant the entry of summary judgment in their favor. In support of this argument, the Fayette County Defendants have submitted the Declaration of Fayette County Defendant Gary

Brownfield, Jr., who is the assistant chief in charge of court security for the Fayette County Court of Common Pleas. [ECF No. 146-9].  Defendant Brownfield declares that he was in charge of providing security at Plaintiff's criminal trial on February 6, 2008, at which Plaintiff was found guilty of aggravated and simple assault on a correctional officer. (Id. at ¶¶ 2, 3, 5).  After sentencing was scheduled and the trial was adjourned, Defendants Brownfield, Barker, Dunkard, and Matthews began escorting Plaintiff back to the Fayette County Prison. (Id. at ¶¶ 6, 7). Plaintiff was not handcuffed during the escort because it was court policy not to have defendants wear handcuffs in court. (Id. at 8).  Instead, as a security precaution, Plaintiff was required to wear around his waist a remote activated electronic security belt system ("stun belt"), which, when remotely activated, discharges approximately 50,000 volts of electricity for a period of 5-8 seconds. (See ECF No. 146-8, R.A.C.C. Belt-in Custody Notification).

Plaintiff continued to have words with the judge as Defendant Brownfield and the other court security officers attempted to move him to the door to the bridge connecting the courthouse to the Fayette County Prison,. (ECF No. 146-9, Declaration of Defendant Brownfield, at ¶ 9). According to Defendant Brownfield, Plaintiff threatened him with violence at that time. (Id. at ¶ 10). The locked door to the bridge was then opened by one of the officers, and the officers followed Plaintiff through the door and onto the bridge. (Id. at ¶ 11).  According to Defendant Brownfield, the bridge is narrow, so that they had to walk single file toward the locked door leading to the prison at the other end of the bridge. (Id. at ¶¶ 12-13).  Defendant Brownfield declares that Plaintiff reached the end of the bridge first then turned around, verbally threatened him, and "took an aggressive posture." (Id. at ¶ 13-14).  Defendant Brownfield states that he asked Plaintiff numerous times whether Plaintiff was threatening him, and Plaintiff "responded affirmatively." (Id. at ¶ 15).  Defendant Brownfield believed that Plaintiff intended to fight him and the other security officers, knew that they could not safely surround Plaintiff due to the narrowness of the bridge, and thought the activation of the stun belt was safer than having the

officers attempt to physically restrain Plaintiff. (Id. at ¶¶ 16-18). Thus, he ordered Defendant Barker, who was holding the remote control, to activate the stun belt. (Id. at ¶ 19). After Plaintiff was subdued, the door to the prison was opened and Plaintiff was turned over to correctional officers. (Id. at ¶ 22).

Based on the foregoing account, it is apparent that Defendant Brownfield perceived that Plaintiff was threatening to engage in a physical confrontation with him and the other security officers, that he was capable of doing so because he was without handcuffs, and that there was no way to safely approach Plaintiff without compromising the safety of his fellow officers. Moreover, Defendant Brownfield was aware of Plaintiff's recent history of assaultive conduct, as evidenced by the conviction he had just received for assaulting a correctional officer. Thus, Defendant Brownfield believed that the use of the stun belt was the best option for subduing Plaintiff.

For his part, Plaintiff has acknowledged that when he was being directed out of the courtroom by one of the court security officers (presumably Defendant Brownfield), Plaintiff "told [the officer] if he put his hands on [Plaintiff] again, that [Plaintiff] would defend [him]self." (Id. at p. 8 (internal p. 21)). Plaintiff has also acknowledged that when the officer started "talking disrespectful" to him, he "started talking disrespectful back." (Id.). Plaintiff then admitted that when they got to the other side of the bridge, Plaintiff repeated to the officer that "if [the officer] put his hands on [him] like that again, [he] would defend [him]self." (Id. at pp. 8-9 (internal pp. 21-22)). While Plaintiff does not believe his comments were threatening, it is clear that Defendant Brownfield believed that Plaintiff was threatening harm, and that such belief was warranted, given the circumstances.[7] It is also apparent that use of the stun belt was "applied in a

---

7

It is also worth noting that a newspaper account of the incident reported that after the guilty verdict, "Hankins threatened to harm security personnel as they escorted him from the courtroom back to the county jail. He shouted threats at the officers as they led him through a covered bridge that connects the courthouse to the county jail." (See

good-faith effort to maintain or restore discipline," and was not done "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. In fact, Plaintiff understood that the stun belt would be used "for attempted or perceived threats." (ECF No. 146-4, Plaintiff's deposition transcript, at p. 6 (internal p. 17)).

Thus, based on the foregoing evidence of record, summary judgment should be granted in favor of Fayette County Defendants Brownfield, Barker, Dunkard, and Matthews, on Plaintiff's Eight Amendment excessive use of force claim.

<u>e.</u>     <u>Placement in Cell with Glass on Bed Frame and<br>Exposed Electrical Wires</u>

Plaintiff claims that the Fayette County Defendants placed him in a cell "with glass all over the bed frame and exposed live electrical wires," on January 3, 2008. Based on the evidence presented, this claim does not rise to the level of an Eighth Amendment violation.

Specifically, with regard to his claim regarding "exposed electrical wires," Plaintiff testified during his deposition that there was a single incident where he reached up to turn on the light in his cell and some loose wires hit his arm and "electrocuted" him. (ECF No. 146-4, Plaintiff's deposition transcript, at p. 22 (internal p. 43)). Plaintiff has not alleged that he was shocked by these wires at any other time during his incarceration at the Fayette County Prison, nor has he produced any testimony or evidence indicating that he suffered any injury from this lone incident that required medical attention.

Similarly, Plaintiff's claim regarding glass in his cell stems from a single incident where Plaintiff claims to have discovered glass "all over the bed frame" when he was placed in his cell. (Id. at p. 23 (internal p. 44)). Although Plaintiff speculates that the glass came from a broken light bulb, Warden Miller declares that the cells at Fayette County Prison contain plastic light

ECF No. 146-10).

bulbs with plastic covers on them, and that there is no source of glass available to inmates on "B Range," where Plaintiff was housed. (ECF No. 146-5, Declaration of Brian Miller, at ¶¶ 10-14). Nonetheless, even accepting as true Plaintiff's testimony that glass was present in his cell, Plaintiff has acknowledged that the glass was there only a short period of time because he used a rag and paper to clean it up. (ECF No. 146-4, Plaintiff's deposition transcript, at p. 24 (internal p. 45)). Moreover, Plaintiff has not alleged that he suffered any injury as a result of the glass incident.

Plaintiff's Eighth Amendment claim in this regard is *de minimis* at best. Accordingly, summary judgment should be entered in favor of the Fayette County Defendants on such claim.

### 3.     Eighth Amendment Claim v. Defendant Burnsworth

Plaintiff alleges that Defendant Burnsworth was deliberately indifferent to his serious medical needs after he was allegedly "electrified" by the use of a stun belt at the Fayette County Jail on February 6, 2008.

In the medical context, a constitutional violation under the Eighth Amendment occurs only when prison officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). "In order to establish a violation of [the] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need[8] involves the "unnecessary and wanton

---

[8]

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correction Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

infliction of pain." Estelle, 429 U.S at 104.  Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury,  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation.  Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).  Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment.  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979), quoting Bowring v. Goodwin, 551 F.2d 44, 48 (4th Cir. 1977).  Furthermore, deliberate indifference is generally not found when some level of medical care has been offered to the inmate.  Clark v. Doe, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").

Here, Plaintiff's medical records indicate that he was seen by medical staff at Fayette County Jail at 8:00 a.m. on February 6, 2008, the date on which Plaintiff was allegedly "electrified" with a stun belt. (ECF No. 141-1 at p. 2).  At that time, Plaintiff complained of chronic back pain and was prescribed Motrin, 400 mg, twice daily. (Id.).  Later the same day, at around 8:30 p.m., Defendant Burnsworth spoke with Plaintiff during her medication rounds, and made the following notation on the Fayette County Jail's Dispensary Cards:

> While passing medications on B range, [Inmate] Hankins stated to me 'why haven't I been admitted to medical yet I have been here for a week and I suffer chronic pain and I have yet to see a doctor.  I need something for pain.'  I explained to the inmate that an order for Motrin was written,

gave him the Motrin, he said thank you and I left.

(ECF No. 141-1 at p. 3).

During his deposition, Plaintiff acknowledged that he saw Defendant Burnsworth on the evening of February 6, 2008, and that Defendant Burnsworth gave him Motrin for his chronic pain. (ECF No. 141-4 at pp. 4 (internal p. 32), 12 (internal p. 134). Plaintiff was also seen in the medical department around noon on February 7, 2008, the day following the alleged stun belt incident. (ECF No. 141-1 at p. 3). At that time, Plaintiff complained of chronic back pain, tooth pain, and gum pain; however, there was no mention of any injury resulting from the use of a stun belt. (Id.). Plaintiff was again provided Motrin for his pain symptoms. Plaintiff was transferred back to SCI-Albion on February 8, 2008. (See ECF No. 141-5 at p. 2).

The medical record from the Fayette County Jail is devoid of any evidence of injuries Plaintiff allegedly suffered as a result of being "electrified" by a stun belt on February 6, 2008. The record does reveal that, upon reporting his symptoms of chronic pain to Defendant Burnsworth and/or the medical staff at the Fayette County Jail, Plaintiff promptly received pain medication. Based on this record, the Court cannot find that Defendant Burnsworth was deliberately indifferent to Plaintiff's serious medical needs. Although Plaintiff's allegations make clear that he is dissatisfied with the medical treatment he received at the Fayette County Jail and believes that a different course of treatment would have been more appropriate and beneficial, "mere disagreements over medical judgment" do not rise to the level of an Eighth Amendment violation. White, 897 F.2d at 110. As a result, summary judgment should be granted in favor of Defendant Burnsworth on Plaintiff's remaining Eighth Amendment claim against her.


**III.     CONCLUSION**

For the foregoing reasons, it is respectfully recommended that:
> 1.     Defendant Burnsworth's Motion for Summary Judgment [ECF No. 139] be granted;

2.     The Commonwealth Defendants' Motion for Summary Judgment [ECF No. 142] be denied with regard to Plaintiff's retaliation claim against Defendant McKnight, but granted as to all other claims against the Commonwealth Defendants; and

3.     The Fayette County Defendants' Motion for Summary Judgment [ECF No. 144] be denied insofar as it is based on Plaintiff's failure to exhaust administrative remedies, but otherwise granted on the merits of Plaintiff's claims.

Based on the foregoing, all Defendants other than Commonwealth Defendant McKnight should be terminated from this case.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of some appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: November 30, 2011

cc:     The Honorable Sean J. McLaughlin
       United States District Judge